## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SHERRI SWANAGIN,**

      **Plaintiff,**

                                              **Civil Action 2:13-cv-434**

      **v.**                                      **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### OPINION AND ORDER

Plaintiff, Sherri Swanagin, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 24), and the administrative record (ECF No. 11). For the reasons that follow, the Court **REVERSES** the Commissioner of Social Security's nondisability finding and **REMANDS** this case to the Commissioner and the ALJ under Sentences Four and Six of § 405(g) for further proceedings consistent with this Opinion and Order.

## I.     BACKGROUND

Plaintiff protectively filed her applications for benefits on April 2, 2009, alleging that she has been disabled since November 8, 2007, at age 41. (R. at 166-72, 173-76.) Plaintiff alleges disability as a result of epilepsy, a heart condition, sleep apnea, and migraines headaches. (R. at

222.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").  ALJ Ken B. Terry held a video hearing on May 17, 2011, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 39-79.)  Barry J. Brown, a vocational expert, also appeared and testified at the hearing.  (R. at 80-89.)  On July 1, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 13-25.)  On March 22, 2013, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-5.)  Plaintiff then timely commenced the instant action.

## II.   HEARING TESTIMONY

### A.      Plaintiff's Testimony

Plaintiff testified that her epilepsy is her most severe impairment and it effects her every day.  (R. at 44.)  Plaintiff was first diagnosed with seizures when she was seven years old.  (R. at 51.)  She described her seizures as absence seizures or grand mal seizures.  (R. at 45.)  Plaintiff testified that the absence seizures occured several times a day causing her eyes roll back or causing her to "draw a blank."  (*Id.*)  She indicated the absentee seizures were usually "brief," lasting "just a few seconds."  (*Id.*)  She said that she does not loose consciousness during these seizures and often continues on doing what she is doing right before the seizure.

Plaintiff described her grand mal seizures as "normal" seizures, where she can have convulsions and loose consciousness.  (R. at 45–46.)  She said that she may need two or three days to recover after a grand mal seizure.  (R. at 50.)  She indicated that she had not had a seizure in 2011, but experienced "several" seizures in 2010, including four in the month of August.  (R. at 63-64.)  She testified that on December 24, 2009, she began to feel a seizure

2

coming on and that she was able to go home and take her medications, which prevented the seizure from occurring.  (R. at 67-68.)  She indicated that the exact number of seizures would be reflected in a calendar that she kept.  She attributed her absence in seizures in 2011 to taking her medication regularly.  (R. at 66.)

Plaintiff testified that the frequency of her seizures tends to vary depending on her menstrual cycle.  (R. at 46.)  She further indicated that stress, lack of sleep, or extreme nervousness can trigger her grand mal seizures.  (R. at 48.)  She indicated that increased stressors such as going through her divorce or stress related to her job induced seizures.  (R. at 49.)  By way of example, Plaintiff dealing with her bills and attending the hearing caused her stress and could lead to seizures.  (R. at 50.)

At the time of the hearing, Plaintiff indicated that she was taking her medication, which included Lamictal, Keppra, and Zonegran.  (R. at 52.)  She further indicated that she took Zoloft for depression, but was not seeing a psychiatrist or counselor at the time of the hearing because they did not accept her insurance.  (R. at 54.)  She said that her medications cause blurred vision and make her feel drowsy, dizzy, and lightheaded.  (R. at 55.)  Plaintiff testified that even with changing her medications, her "thought process" and motor skills are affected. (R. at 75-76.)  Plaintiff believed that she would be unable to sustain work due to her inability to have regular attendance "because of the frequency of her seizures."  (R. at 78.)  Plaintiff testified she started getting her medications from the manufacturers in October 2009.  (R. at 67.)

In terms of activities, Plaintiff testified that "to get out of the house," she sometimes went to play Bingo with her mother, would visit family, or just take a walk.  (R. at 59.)  She indicated that although she performs household chores, if she has had a grand mal seizure, she will not

3

cook on the stove.  (R. at 60.)  She added that she showers without assistance, but will refrain from showering for a couple of days right after having a grand mal seizure.  (*Id*.)  She stated that she never obtained a drivers licence because of her epilepsy.  (R. at 40.)

Plaintiff testified that she was last employed full time as a hospital registrar, a job she held for eight years, until November 2008.  (R. at 42-43.)  She stated that she was terminated from this position because she was unable to accurately perform her job duties, which she attributes to her seizures and the side effects from medications.  (*Id*.)  Plaintiff indicated that since her termination from this position, she has been employed at a few seasonal jobs.  (R. at 41-42.)

After the hearing, Plaintiff provided the seizure calendar she referenced during the hearing.  (R. at 607-13, 1013-23.)  Plaintiff recorded only her grand mal seizures (tonic-clonic seizures).  The calendar reflected that Plaintiff had four seizures in June 2009, four in July 2009, six in August 2009, two in September 2009, one in October 2009, two in November 2009, and one on December 24, 2009.  (R. at 1014.)  In 2010, Plaintiff documented one seizure in October, six in November, and seven in December.  (*Id*.)  In 2012, Plaintiff documented two seizures in May, two in October, five in November, and one in December.  (R. at 607-609, 613.)

## B.  Vocational Expert Testimony

Vocational expert Barry J. Brown ("VE") testified that Plaintiff's past relevant work included an administrative clerk and cashier/checker, both performed at light exertion, semi-skilled level; and a collection clerk, performed at sedentary exertion, skilled level.  (R. at 80-81.)

The ALJ proposed a hypothetical to the VE, asking him to consider an individual with Plaintiff's age, education, and work experience, with the following capabilities: functional capacity for medium exertional work; can lift and/or carry and push and/or pull a maximum of 50 pounds occasionally and 25 pounds frequently; sit for four hours at a time and a total of eight hours in an eight-hour work day; and walk and/or stand up to four hours at a time and a total of six hours in an eight-hour work day; but precluded from ladders, ropes, or scaffolds and work hazards such as unprotected heights and moving machinery; and further limited to simple, unskilled, and repetitive work in positions without high stress, fast-paced work, or strict production quotas.  (R. at 82.)  Based on the above hypothetical, the VE acknowledged that the hypothetical individual could not perform Plaintiff's past relevant work.  (R. at 83.)  The VE testified that the individual would, however, be able to perform work at the sedentary, light, and medium levels.  (*Id.*)  Examples of jobs at the medium exertional level included hand packager, with 12,500 jobs in the state of Ohio; cleaner, with 18,000 jobs in the state of Ohio; and machine tender, with 4,000 jobs in the state of Ohio.  (R. at 83–84.)

The VE further testified that competitive employment would be precluded if the individual needed to be off task ten times per day for approximately three minutes each or were to miss one day or less per month.  (R. at 84–85.)  The VE indicated that if the individual needed to be off task ten minutes per day, the individual could still perform ten percent of the jobs identified.  (R. at 85–86.)  The VE added that anything greater than ten minutes total per day would be work preclusive.  (R. at 87.)

### III.    MEDICAL RECORDS

**A.    Records Relating to Plaintiff's Mental Impairments**

### 1.      Riverside Methodist Hospital

Plaintiff was admitted to Riverside Methodist Hospital for suicide ideation on April 4, 2009.  (R. at 798-809.)  She presented with constant depression for the past year, acute low energy, continuous marital problems, episodic sleep disturbance, continuous stress, and constant suicidal thinking for the month prior.  (R. at 800.)  Her assigned intake Global Assessment of Functioning ("GAF") score was 35.[1]  (R. at 805.)  She was started on Zoloft, and after two days, she had "noticeably improved."  (R. at 807.)  Plaintiff was discharged with a diagnosis of major depressive disorder.  (*Id.*)

### 2.      Michael G. Saribalas, D.O., C.B.S.M.

Plaintiff sought mental health treatment from psychiatrist Dr. Saribalas on April 23, 2009.  Plaintiff reported that she felt depressed with sleep issues, but admitted that she was not using her CPAP machine on a regular basis or following any of her sleep specialists's recommendations.  (R. at 814.)  Upon mental status examination, Plaintiff's mood was depressed, her affect was bland, and her insight and judgment were noted to be fair.  Dr. Saribalas diagnosed Plaintiff with major depressive disorder and assigned a GAF score of 60.[2]

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR").  A GAF score of 35 is indicative "Some impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood."  DSM-IV-TR at 32-34.

[2]GAF score of  51-60 is indicative of moderate symptoms (*e.g*., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g*., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 32-34.

(R. at 815.) Dr. Saribalas increased Plaintiff's Zoloft dosage and instructed Plaintiff to follow up with sleep specialist, Dr. Fulop, for her sleep apnea and with neurology for her seizures. (*Id.*)

On June 4, 2009, Plaintiff reported to Dr. Saribalas that she continued to have difficulty concentrating, focusing, and was having bad dreams. On mental status examination, Plaintiff had a depressed mood with a bland affect. Her speech was decreased in rate and tone. She was tangential and circumstantial. Dr. Saribalas increased Plaintiff's Zoloft and again recommended that Plaintiff follow up with Dr. Fulop for sleep apnea and with neurology. (R. at 816.) He noted, however, that Plaintiff appeared "significantly better" since her last visit. (*Id.*)

### 3. Peggy Cook, Ph.D.

On July 28, 2009, Dr. Cook completed a mental status questionnaire finding that Plaintiff had a mild depressive symptoms, flat affect, decreased concentration, and anxiety related to health issues and environmental stresses. (R. at 270-72.) Dr. Cook noted that she had seen Plaintiff once on April 21, 2009. (R. at 270.) Dr. Cook noted that Plaintiff informed her that due to her husband canceling her insurance, she could not afford to see Dr. Cook. (R. at 271.)

### 4. Sudhir Dubey, Ph.D.

On June 1, 2010, consulting psychologist Sudhir Dubey, PsyD., evaluated Plaintiff. (R. at 960-65.) Plaintiff reported that she was going through a divorce, which had affected her relationships with her children. She indicated that her typical day includes activities such as managing her home, including cleaning, laundry, and reading. She reported that she can independently perform daily chores and bathe. She indicated that she socializes with family and friends on a regular basis. Plaintiff stated that her last job as a seasonal cashier ended in January

7

2010 and that her mental and physical disorder did not affect her employment. She added that her current situation of physical symptoms affect her ability to work.

Dr. Dubey noted that Plaintiff exhibited alert and responsive behavior. During the mental status examination, Plaintiff was relaxed and cooperative. Her eye contact was within normal limits, and her thought processes were coherent and logical. Plaintiff's affect was appropriate to the content of the interview. Dr. Dubey noted that Plaintiff reported a variety of symptoms, both subjective and objective. She reported that her mood and insight were good and that she was not experiencing episodes of crying. She denied changes in weight, appetite, or sleep habits. She indicated that energy level was decreased because of her seizures. She reported no symptoms of panic or anxiety. Dr. Dubey assigned Plaintiff a GAF score of 70[3] and opined that Plaintiff has no significant mental impairments that would limit work functioning. (R. at 964-65.)

### 5.     State-Agency Evaluations

State-agency psychologist, Catherine Flynn, Psy.D., performed a "Psychiatric Review Technique" on September 9, 2009, based on her review of the medical record. (R. at 896-909.) Dr. Flynn opined that Plaintiff had mild restrictions in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 906.) Dr. Flynn also found that Plaintiff had experienced one or two episodes of decompensation. (*Id.*) Dr. Flynn noted that Plaintiff's statements about her

---

[3]A GAF score of between 61-70 is indicative of only mild symptoms or some difficulty with social, occupational or school functioning, but such a person can generally functioning well and have some meaningful interpersonal relationships. DSM-IV-TR at 32-34.

condition are generally consistent with the medical evidence. She opined that with continued treatment, Plaintiff's condition "is not expected to last months." (R. at 908.)

**B.    Physical Impairments**

**1.    Jean Cibula, M.D.**

Plaintiff began seeing neurologist Jean E. Cibula, M.D., in December 2002 for evaluation of her seizure disorder. Dr. Cibula believed Plaintiff had intractable primary generalized epilepsy and scheduled Plaintiff for the epilepsy monitoring unit to confirm the types of seizures she was experiencing. (R. at 719-21.) Dr. Cibula continued to treat Plaintiff every three to four months for evaluation and medication adjustments. (R. at 695-718.)

On December 20, 2006, Dr. Cibula wrote on a prescription that Plaintiff may not work second or third shift due to her medical condition. (R. at 688.)

On March 7, 2007, Dr. Cibula reported that Plaintiff takes "three medications to maintain the seizure control that she has." (R. at 687.) Dr. Cibula noted that the medications caused side effects including drowsiness, dizziness, and some cognitive fogging. Dr. Cibula opined that Plaintiff's medications "may indeed impact" her job performance. (*Id.*)

In August 2007, Plaintiff reported she was experiencing problems at work due to her seizures. Plaintiff said she had three to four brief seizures a day and had a lot of fatigue. Dr. Cibula noted that Plaintiff's seizures were "somewhat" controlled by medications and that control of her seizure's was "still not perfect." (*Id.*) Dr. Cibula emphasized the need for exercise and reemphasized the need for following up on Plaintiff's sleep evaluation given her fatigue. Dr. Cibula stated that Plaintiff had been doing well except around her menses. (*Id.*) Dr. Cibula stated medications have had a "relatively limited success." (R. at 691.)

9

In December 2007, Plaintiff informed Dr. Cibula that she had been let go from her job. Plaintiff was experiencing a couple of seizures a day during menses.  Dr. Cibula noted Plaintiff's seizures were "extremely difficult to control."  (R. at 690.)

> **2.    Adam Ueberroth, M.D.**

Plaintiff began treating with neurologist, Dr. Ueberroth of Neurological Associates Inc. on October 9, 2008.  (R. at 736-39.)  Plaintiff reported that she had suffered from seizures since childhood.  She indicated that she experienced both generalized tonic-clonic seizures and brief seizures, lasting from five to thirty seconds.  (R. at 736.)  Plaintiff also reported that her seizures were brought on by stress, too much or too little sleep, and her menses.  (*Id.*)  Plaintiff further reported that her seizures ranged from a couple of times per week to multiple daily seizures. (*Id.*)  After examining Plaintiff, Dr. Ueberroth diagnosed her with an idiopathic generalized seizure disorder that is difficult to control with antiepileptic medications.  (R. at 738.)  Dr. Ueberroth stated that Plaintiff's medications cannot be increased due to side effects and cannot be decreased due to breakthrough seizures.  (*Id.*)  Dr. Ueberroth concluded that Plaintiff was a very difficult case and referred her for further evaluation with Dr. Hall, an epilepsy specialist, and Dr. Fulop, a sleep specialist.  (*Id.*)

On August 10, 2009, Plaintiff reported that she had not been able to undergo the testing Dr. Hall prescribed or use her medications due to loss of insurance.  Dr. Ueberroth discussed plans to get assistance given Plaintiff's limited resources.  Dr. Ueberroth also instructed Plaintiff on how to ween off her medication, Keppra.  (R. at 928-29.)

On August 19, 2009, Dr. Ueberroth reported that Plaintiff has refractory epilepsy and that in the past while on several anti-medications, at best, she was having daily brief seizures.  She

also noted that Plaintiff had recently lost her health insurance, and as a consequence, had to discontinue some of her anti-seizure medications.  Dr. Ueberroth indicated that the increased seizure activity Plaintiff reported was due to the discontinuation of some of her medications. Plaintiff reported that she has not been able to work because of these seizures.  Plaintiff told Dr. Ueberroth that she was working on re-establishing her insurance coverage as well as applying for medication assistance programs.  Dr. Ueberroth's goal was to reduce her seizure activity to the point where she will be able to return to work, which he hoped would take one or two months. Dr. Ueberroth opined that Plaintiff will never be able to achieve seizure freedom because she has never lived without seizures even on four anti-seizure medications.  (R. at 926.)

On September 14, 2009, Plaintiff reported that she was having uncontrollable seizures throughout the day.  Dr. Ueberroth stated that Plaintiff needed to undergo an epilepsy monitoring unit evaluation and referred Plaintiff to Ohio State Hospital.  (R. at 927-28.)  He indicated that Plaintiff needed to be on a better medication regimen, but that this was not possible because Plaintiff was not able to afford the medications.

Plaintiff reported continued seizures in November 2009.   Plaintiff also reported that she was able to get her medications, including Lamictal and Zonegran, from the manufacturers.  (*Id.*) Dr. Ueberroth felt it was reasonable for Plaintiff to go back to work "knowing that we are probably never going to get her seizure-free as long as she is in a safe environment."  (R. at 947.)

In February 2010, Dr. Ueberroth opined that Plaintiff's seizures were refractory to medical treatment and that he was limited in treating her without having an epilepsy monitor unit evaluation performed.  Dr. Ueberroth indicated that without the monitor he could not tell how many seizures Plaintiff was actually having.  He opined that if Plaintiff was having as many

11

seizures as reported, she would be precluded from continued employment as lapses of

consciousness could be dangerous and detrimental to her occupation.  (R. at 945-46.)  Dr.

Ueberroth also indicated that he was unable to increase her medications to cost issues given that

Plaintiff was getting her medications free from the manufacturer.

On March 4, 2010, in a letter to Plaintiff's counsel, Dr. Ueberroth explained that Plaintiff

has two types of seizures.  One seizure type is generalized tonic clonic and the other is

characterized as a brief loss of consciousness that is also characteristic of a generalized seizure

disorder.  Dr. Ueberroth opined as follows:

> [Plaintiff's] seizures, at best, have been quite refractory to medical treatment.  She
> has seizures multiple times daily and these seizures are characterized by brief periods
> of loss of consciousness.  Because of these episodes of loss of consciousness, she is
> unable to drive, operate heavy machinery, climb ladders, or perform tasks that could
> result in harm to herself or others should she lose consciousness.  The frequency of
> these seizures, in fact, makes it difficult for her to pursue any employment at this
> point.

(R. at 956.)  He added that Plaintiff "may be able to improve her seizure control, however, she

has no medical insurance and is unable to afford further evaluation and treatment . . . ."  (*Id*.)

That same day, in connection with the letter, Dr. Ueberroth completed a Medical Source

Statement in which he opined that Plaintiff's ability to stand, lift, walk, sit and perform postural

activities would be affected if she experiences loss of consciousness and that she needed a

sit/stand option given that she "has seizures frequently [and] abrupt loss of consciousness."  (R.

at 953-54.)

12

3.      **James P. Fulop, M.D.**

Plaintiff consulted with sleep specialist, Dr. Fulop at Neurological Associates Inc. on November 20, 2008, regarding her sleep apnea issues.  Dr. Fulop noted Plaintiff was diagnosed with obstructive sleep apnea five years prior and was using an old nasal mask.  Following examination, Dr. Fulop recommended that Plaintiff go the sleep lab for re-titration of her sleep apnea mask.  (R. at 734.)

4.      **Charles Hall, M.D.**

On December 2, 2008, Dr. Hall, at Neurological Associates Inc. evaluated Plaintiff for "management options" of her seizures.  Dr. Hall recommended that Plaintiff follow through with her sleep evaluation because under-treated sleep apnea could worsen epilepsy.  Dr. Hall also recommended admitting Plaintiff to the epilepsy monitoring unit for spell classification, seizure classification and medication adjustment.  (R. at 731-33.)

5.      **Mt. Carmel/St. Anne's Hospital**

On March 11, 2008, Plaintiff presented to the emergency room due to a seizure.  (R. at 746-58.)  Plaintiff was unable to describe what happened but stated that she woke with bruising on her back, buttock and left arm.  (R. at 748.)

On July 25, 2009, Plaintiff presented to the emergency room after having a seizure.  (R. at 843-54.)  She had a 1-2 minute seizure and was post-ictal for approximately ten minutes with lightheadedness and dizziness.  (R. at 843.)  Plaintiff reported that she had a history of increased seizures during her menses.  (R. at 845.)  Plaintiff also stated that she had been unable to take her medication.  Plaintiff was started back on Keppra and told to follow up with her seizure specialist to discuss more affordable medications.  (R. at 846.)

13

On August 7, 2009, Plaintiff presented to the emergency room after having a full body tonic seizure.  (R. at 825-42.)  Plaintiff reported that she was having multiple seizures for the last few days.  (R. at 828.)  She indicated that she had been out of her seizure medication for three days.  Plaintiff was given medications and prescriptions and advised to follow up with her neurologist for affordable medication options.  (R. at 839.)

On September 2, 2009, Plaintiff was admitted for reproducible chest pain and a fever. (R. at 857-858.)  Plaintiff underwent an echocardiogram and stress test that were negative.  (R. at 857.)  Upon discharge, Plaintiff was diagnosed with atypical chest pain, seizure disorder, anxiety, depression, and iron-deficiency anemia.  (*Id.*)

### 6.    **Emily Klatte, M.D.**

On November 11, 2010, Dr. Klatte saw Plaintiff in consultation to evaluate her longstanding epilepsy as well as a potential admission to the epilepsy monitoring unit.  (R. at 985-87.)  After examining Plaintiff and reviewing her history, Dr. Klatte concurred that Plaintiff needed epilepsy monitoring completed to quantify the amount of seizures she was having as well the type of seizures she was having.  (R. at 987.)

Plaintiff underwent an epilepsy monitoring unit evaluation from December 6, 2010, through December 10, 2010.  (R. at 993-97.)  During the first day, while taking her medications, Plaintiff did not "press her event button" to indicate that she had a seizure but reported in hindsight that she felt she had several brief absence seizures.  (R. at 1002.)  Dr. Klatte reported that these reported seizures "were not associated with any distinct electrographic changes or epileptiform discharges."  (*Id*.)  The next day, upon reducing some of her Lamictal medication and withholding one dose of Keppra, Plaintiff had two generalized tonic/clonic seizures.  In

14

Plaintiff's final two days, her medications were restored.  (R. at 1002–03.)  Plaintiff did not press

the even button during these two days, but said that in hindsight that she had a couple of brief

absent seizures.  Dr. Klatte indicated, however, that these reported seizures were not associated

with any distinct electrographic changes.  (*Id*.)  In summary, Dr. Klatte reported that Plaintiff's

EEG and clinical events both improved after being restarted on her home medications.  Dr.

Klatte noted that if Plaintiff continued to experience frequent seizures, she would need an

adjustment in her medication.  Dr. Klatte stated and informed Plaintiff that "[i]t is likely that she

is not having quite as many seizures as she believes she has."  (R. at 995.)  Dr. Klatte explained

to Plaintiff that when on medication, "her perceived small seizures do not show up on EEG."  (R.

at 999.)  She opined that Plaintiff's "epilepsy may be fairly well controlled right now."  (*Id*.)  Dr.

Klatte also noted that she did not believe that Plaintiff would be a good candidate for surgery.

(R. at 1003.)

7.      **State-Agency Evaluations**

In September 2009, state-agency physician Teresita Cruz, M.D., reviewed the record and

assessed Plaintiff's physical functioning capacity.  (R. at 910-17.)  Dr. Cruz opined that Plaintiff

could lift, carry, push, and/or pull fifty pounds occasionally and twenty five pounds frequently;

stand and/or walk about six hours in a workday; and sit for about six hours in a workday.  (R. at

911.)  She further opined that Plaintiff should never use ladders/ropes/scaffolds and should avoid

concentrated exposure to fumes, odors, poor ventilation, and exposure to hazards, such as

machinery and unprotected heights, due to her seizure history.  (R. at 912, 914.)  Dr. Cruz found

Plaintiff's statements to be only partially credible.  (R. at 915.)  She noted that there exists no

objective evidence of severity of seizures or the effects Plaintiff alleges when she is medicated

appropriately. Dr. Cruz further noted that Plaintiff reported that when she does not take her medication as prescribed, her seizures frequency increases. (*Id*.)

In November 2009, state-agency physician Myung Cho, M.D., reviewed the record and found Plaintiff was not following prescribed treatment. (R. at 938.)

## C.     Appeal Counsel Exhibits

In January 2012, Plaintiff saw Dr. Klatte for follow up care. Dr. Klatte indicated that Plaintiff's "longstanding idiopathic generalized epilepsy . . . remains refractory to medications." (R. at 1033.) She also noted that Plaintiff had "not had a tonic clonic seizure in quite some time." (*Id*.) Plaintiff reported, however that she continued to experience starring spells. Dr. Klatte increased her Keppra in an effort to reduce the staring spells. Plaintiff reported that her mood was good. Dr. Klatte indicated that Plaintiff will need to be admitted to the epilepsy-monitoring unit again to reassess how much of her reported seizure activity is nonepileptic. (R. at 1034.)

In May 2012, Plaintiff reported that her staring spells had reduced with the increased Keppra but they were still occurring several times a week. Dr. Klatte noted that she was unsure how many of these weekly staring spells were epileptic in nature given that the past tests demonstrated that they were nonepileptic in etiology. She also noted that Plaintiff's mood was "much better" and that "[s]he appears to be doing very well in this regard." (R. at 1031.) Dr. Klatte indicated that Plaintiff was tolerating her medications "without any significant side affects although [Plaintiff] does believe that the Lamictal makes her sleepy." (*Id*.) Dr. Klatte noted that Plaintiff's seizures were better with the increased Keppra and decreased Lamictal. (R. at 1031-32.)

In November 2012, Plaintiff reported to Dr. Klatte that she had three tonic clonic seizures the month prior and continued to have sporadic staring spells.  (R. at 1053.)  Plaintiff reported that she had been feeling more tired and had increased forgetfulness due to the increased Keppra.  (*Id.*)  Plaintiff also indicated that she had not decreased her dosage of Lamictal since her last appointment as Dr. Klatte thought she had done.  (*Id.*)  Dr. Klatte concluded that Plaintiff suffered both absence and occasional tonic seizures as well as nonepileptic events.  (R. at 1054.)  She described Plaintiff's epileptic events as consisting of absence seizures and occasional tonic clonic seizures and her non-epileptic events as consisting of brief staring events.  (*Id.*)  Dr. Klatte noted that "[i]t might be worthwhile to admit her to the epilepsy-monitoring unit again to discern how many epileptic seizures she is having . . . ."  (*Id.*)

In January 2013, Plaintiff underwent inpatient continuous video monitoring that revealed a myclonic generalized epilepsy disorder.  (R. at 1095-96.)  Plaintiff subjectively reported that she suffered four episodes of starring, but did not mark the events.  (R. at 1096.)  None of the four reported episodes had electrographic correlation such that they were noted to be "indicative of nonepileptic spells."  (*Id.*)  Plaintiff presented to the emergency room in January 2013, after having a seizure.  (R. at 1079-94.)  Plaintiff reported that she had three seizures during the week.  (R. at 1087.)

On May 23, 2013, Plaintiff returned to Dr. Klatte complaining of frequent starring spells but no further tonic/clonic seizures.  Dr. Klatte discussed possible future options including changes in medications and a possible nerve stimulator.  (R. at 1025-27.)

On November 23, 2013, Plaintiff was transported by EMS to Mount Carmel East due to having two seizures within 24 hours.  (R. at 1040-51.)  Plaintiff stated that she had just had a

17

medication change two days earlier that included decreasing her Lamictal and adding Depakote. (R. at 1040.)

## IV.  THE ADMINISTRATIVE DECISION

On July 1, 2011, the ALJ issued his decision.  (R. at 13-25.)  At step one of the sequential evaluation process,[4] the ALJ found that Plaintiff had not engaged in substantially gainful activity since November 8, 2007.  (R. at 18.)  The ALJ found that Plaintiff had the severe impairments of epilepsy, obstructive sleep apnea, and depression.  (*Id.*)  The ALJ also found that Plaintiff's dependent personality traits disorder was not a severe impairment because it did not cause more than minimal limitation in Plaintiff's ability to perform basic work activities.  (R. at 19.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

---

[4] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

18

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c).  The claimant can lift and/or carry and push and/or pull a maximum of 50 pounds occasionally and 25 pounds frequently; sit for four hours at a time and a total of eight hours in an eight hour work day; and walk and/or stand up to four hours at a time and a total of six hours in an eight hour work day.  The claimant is precluded from ladders, ropes, or scaffolds; and work hazards such as unprotected heights and moving machinery.  She is further limited to simple, unskilled, and repetitive work in positions without high stress, fast-paced work, or strict production quotas.

(R. at 20.)  In reaching this determination, the ALJ assigned "significant weight" to the opinion of treating neurologist, Dr. Ueberroth.  (R. at 22-23.)  The ALJ also found Dr. Dubey's opinion that Plaintiff has no significant mental impairments that would limit work functioning is generally consistent with the record and Plaintiff's limited mental health treatment.  (R. at 23.)  The ALJ also gave "significant weight" to the assessments of the state-agency reviewing physicians and psychologists, Drs. Cruz, Cho, and Flynn.  (*Id.*)

The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  He concluded, however, that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  (R. at 21.)

Relying on the VE's testimony, the ALJ determined that other jobs exist in the national economy that Plaintiff can perform.  (R. at 24-25.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 25.)

### V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    LEGAL ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ erred by improperly assessing

her credibility.  Plaintiff alternatively seeks remand under Sentence Six of 42 U.S.C. § 405(g) for

administrative consideration of new and material evidence.  (ECF No. 14).  The Court considers

each of these contentions of error in turn.

### A.    Credibility Assessment

The United States Court of Appeals for the Sixth Circuit has provided the following

guidance in considering an ALJ's credibility assessment:

> First, the ALJ will ask whether the there is an underlying medically
> determinable physical impairment that could reasonably be expected to
> produce the claimant's symptoms.  20 C.F.R. § 416.929(a).  Second, if the
> ALJ finds that such an impairment exists, then he must evaluate the intensity,
> persistence, and limiting effects of the symptoms on the individual's ability
> to do basic work activities.  *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he

[or she] had the opportunity to observe the witness's demeanor."  *Infantado v. Astrue*, 263 F.

App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th

Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining

to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew,

resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  Despite

this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial

evidence."  *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be

"based on a consideration of the entire record."  *Rogers*, 486 F.3d at 247 (internal quotation

omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific

to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

The ALJ, in assessing Plaintiff's credibility, noted that she had alleged impaired concentration, lapses of focus, and seizures.  He concluded that Plaintiff's "impairments could reasonably be expected to cause the alleged symptoms," but that her statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible."  (R. at 21.)  In support of this conclusion, the ALJ cited Plaintiff's medical history, treatment, and examination reports, the degree of medical treatment required, and her self reports of her activities and lifestyle.  The ALJ found that when Plaintiff is "on her regular regimen of medications, . . . she has been able to control her seizures relatively well."  (*Id.*)  He noted an inconsistency in her

22

testimony regarding the specific date an incident occurred and the date reflected in her calendar, indicating that "this inconsistency . . . casts a shadow of doubt as to the accuracy to which she is reporting seizure activity." (*Id*.) The ALJ concluded that "the frequency of seizures . . . would not require the claimant to take significant days off work as they seem to be occurring only a few times per year when she is medically compliant." (R. at 22.) The ALJ noted that Plaintiff began getting her medications in October 2009, had no seizures in 2011 and only a few in 2010. (R. at 21.)

The ALJ offered the following limited discussion relating to Plaintiff's alleged absentee seizures and side effects from the medications:

> The claimant testified that her absenteeism seizures cause moments of lapses of concentration that take a few moments to recover. She further testified that her medications for her seizure medications slow her down and preclude her from keeping pace with her former employment. She further testified that her motor skills and typing speed per testing were reduced. While the residual functional capacity identified int his decision would preclude her former work by limiting the claimant to the positions that do not require fast-paced work or strict production quotas, it would not preclude all work at all activity levels.

(R. at 22.) In addition, the ALJ cited Plaintiff's ability to do house work, maintain her personal hygiene, and sustain seasonal work in support his conclusion that she can work within the RFC. He also noted Plaintiff's receipt of unemployment benefits during part of 2010, stating that receipt of these benefits, combined with her activity levels, demonstrated a greater level of functioning than she alleged.

Finally, within his credibility assessment, the ALJ indicated that he accorded "significant weight to Dr. Ueberroth's November 2009 statement that it was reasonable for her to go back to work in a safe environment and his contemporaneous RFC assessment and "significant weight"

to state-agency physician Dr. Cruz's September 2009 RFC assessment.  The ALJ concluded his

credibility assessment as follows:

> I am not totally unsympathetic with the claimant's condition and efforts to
> work.  However, her seizure impairment appears to be controlled so long as she is
> taking her prescribed medicine, as is documented by her own testimony and the
> seizure calendar she provided showing very few seizures.
>
> *        *        *
>
> In sum, the residual functional capacity is supported by the claimant's alleged
> limitations, the medical findings relating to her seizure activity with proper
> treatment, the opinion evidence of record, and the claimant's testimony at the
> hearing.

(R. at 23.)

Upon review of the record, the Court cannot conclude that the ALJ's credibility

assessment is supported by substantial evidence.  Because Plaintiff alleges disability due to the

frequency of both tonic clonic and absence seizures, the latter of which she alleges occur

multiple times per day, the ALJ's assessment of the frequency and limitations of her seizures is

of paramount importance.  With regard to her daily absence seizures, the ALJ acknowledged that

Plaintiff testified that "her absenteeism seizures cause moments of lapses of concentration that

take a few moments to recover."  (R. at 22.)  He does not, however, explicitly discuss his

findings with regard to Plaintiff's allegations of absentee seizures.  Instead, he appears to lump

both types of seizures together and conclude that both are controlled by the medications.  (*See* R.

at 22 (stating that Plaintiff's seizures "seem to be occurring only a few times per year when she

is medically compliant"); R. at 23 (stating that Plaintiff's "seizure impairment appears to be

controlled so long as she is taking her prescribed medicine")).  Consistently, the ALJ did not set

forth any accommodations in Plaintiff's RFC that would accommodate her alleged daily

absenteeism seizures. Further, in setting forth the number of representative jobs available, he included the numbers the VE offered in response to the hypothetical that did not include reductions attributable to lapses in concentration. (*See* R. at 84–87 (VE testifying that if the individual would be off task ten minutes per day, only 10% of the jobs identified would remain, and any additional time beyond ten minutes would be work preclusive).) Thus, the ALJ implicitly found Plaintiff's allegations of daily absenteeism seizures not credible.

The bases the ALJ offers for discounting Plaintiff's credibility are either invalid or do not apply to Plaintiff's testimony concerning her absenteeism seizures. First, the ALJ's discounting of her credibility because she testified that a particular event occurred on December 24, 2009, rather than December 24, 2010, as reflected on her calendar, is unfair given that Plaintiff explicitly and repeatedly informed the ALJ that she could not be sure as to how many or the timing of her grand mal seizures without her calendar. (*See* R. at 66–70 (". . . without my calendar, I couldn't tell you how many I've had . . .   And I'm not . . . exactly sure of all these dates, but I mean, I would have to look over [my calendar]").)  Regardless, Plaintiff's ability to recall exactly when and how many grand mal (tonic clonic) seizures she had suffered over the past several years in no way undercuts her testimony that she has continued to experience frequent absence seizures on a daily basis.

The ALJ's next basis for discounting credibility—that her Plaintiff's seizures seem to be occurring only a few times per year when she is medically compliant—is both unsupported and inapplicable to her allegations of absentee seizures. The ALJ noted that Plaintiff had experienced only a few seizures since she began consistently taking medications in October 2009, with only a few seizures in 2010 and none in 2011. But Plaintiff's seizure calendar

reflects that she experienced *four* tonic clonic seizures between October and December in 2009 and *fourteen* tonic clonic seizures in 2010, all while medically compliant. Moreover, Plaintiff's calendar reflects only tonic clonic seizures, not absence seizures. As set forth above, Plaintiff consistently reported frequent absence seizures to her treating physicians and testified that she continued to experience absence seizures in 2011.

Plaintiff's ability to do housework, maintain hygiene, and ability to perform some seasonal work for two months likewise does not undercut her testimony that she experiences frequent absence seizures. The record does not bear out any contention that Plaintiff did not experience absentee seizures while performing these activities. Plaintiff explained during her testimony that her absence seizures are brief, that she does not loose consciousness, and that she returns to whatever she was doing when the seizures end. As the VE testified, these lapses, depending on their frequency, will impact an individual's ability to perform certain types of jobs. No record evidence suggests, however, that these absenteeism seizures would preclude Plaintiff from performing various tasks; instead, the evidence suggests that it may just take longer for her to perform them. Indeed, this is exactly the reason that Plaintiff was terminated from her position in 2008. (*See* R. at 42–43 (testifying that she could not keep up with typing the requisite words per minute and completing the requisite number of charts).) *Cf. Gabbard v. Comm'r of Soc. Sec.*, No. 3:11-cv-426, 2012 WL 5378747, at *14 (S.D. Ohio Oct. 30, 2012) ("[T]he ability to perform intermittent and interrupted daily functions such as driving, grocery shopping, or chores, is not evidence of an ability to perform substantial gainful activity." (citing *Walston v. Gardner*, 381 F.2d 586–87 (6th Cir. 1967)).

26

Finally, the ALJ's reliance upon Drs. Ueberroth's and Cruz's 2009 opinions likewise fail to lend the requisite support to his credibility assessment as it relates to Plaintiff's allegations of absentee seizures. First, State-agency reviewing physician Dr. Cruz rendered her opinion in September 2009, *prior* to Plaintiff having access to medications due to financial issues. In support of her opinion, Dr. Cruz cites only Plaintiff's testimony that her seizures increase in frequency when she does not take her medications when prescribed. As noted above, one month after Dr. Cruz rendered her opinion, Plaintiff obtained her medications from the manufactures. Even with this medication, over the next fifteen months, Plaintiff experienced eighteen tonic clonic seizures, as well as an undocumented number of absentee seizures. Second, read in context, treating neurologist Dr. Ueberroth's March 2010 statements cut against rather than support the ALJ's credibility assessment. Dr. Ueberroth attached a letter to his Medical Source Statement in which he stated that Plaintiff's seizures, "at best, have been quite refractory to medical treatment." (R. at 956.) He added that Plaintiff experiences "seizures multiple times daily." (*Id*.) Consistently, within the Medical Source Statement, he opined that Plaintiff required a sit/stand option given that she "has seizures frequently [and] abrupt loss of consciousness." (R. at 953-54.) Notably, even though the ALJ accorded treating physician Dr. Ueberroth's opinion "significant weight," (R. at 23), he neither included a sit/stand option within Plaintiff's RFC nor explained why he rejected it. Moreover, in failing to include a limitation to address Plaintiff's alleged absentee seizures, the ALJ rejected, without explanation, Dr. Ueberroth's statement that Plaintiff experiences seizures multiple times daily.

The Sixth Circuit has held that "even if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the

ALJ's decision will be upheld as long as substantial evidence remains to support it." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) (citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012)).  Here, substantial evidence does not remain to support the ALJ's credibility determination.  That Plaintiff sought to obtain unemployment compensation during a portion of 2010 is not enough to invalidate her testimony regarding her absentee seizures in view of the record evidence as a whole.  First, Plaintiff consistently reported that she suffered from these frequent absenteeism seizures to all of her treating physicians.  Second, *none* of her treating neurologists ever opined that her medications had fully resolved all seizure activity.  (*See, e.g.*, R. at 687 (treating neurologist Dr. Cibula noted that Plaintiff's seizures were "somewhat" controlled by medications); R. at 690 (Dr. Cibula noted that Plaintiff's seizures were "extremely difficult to control"); R. at 736–39, 926, 945–46 (treating neurologist Dr. Ueberroth indicated that Plaintiff was a difficult case, labeling her epilepsy as "refractory" to treatment and opining that she would never be able to achieve seizure freedom because she was unable to do so even on four anti-seizures medications); R. at 993–1003 (Neurologist Dr. Klatte, upon review of EEG, opining that epileptic activity "may fairly well controlled [with medications] *right now*" (emphasis added), but indicating that Plaintiff continued to experience non-epileptic small seizures and that she may need medication adjustments in the future).[5] Notably, the ALJ neglected to mention any of these statements and opinions within his credibility assessment.  Finally, the VE testified that lapses in concentration exceeding ten

---

[5]As discussed below, in records the ALJ did not have before him, Plaintiff continued to report both tonic clonic and absentee seizures to Dr. Klatte, who stated that Plaintiff's "longstanding idiopathic generalized epilepsy . . . remains refractory to medications."  (R. at 1033, 1053–54, 1025–27.)

minutes per day would be work preclusive in view of the other limitations set forth in the RFC.

Accordingly, the ALJ's credibility assessment errors are not harmless.

Notwithstanding this finding, the Court concludes that remand for consideration of the

evidence Plaintiff submitted to the Appeals Council after the hearing is appropriate.

**B.    New Evidence**

Sentence six of 42 U.S.C. § 405(g) provides in relevant part as follows:

> The Court may, on motion of the Secretary made for good cause shown before he
> files his answer, remand the case to the Secretary for further action by the Secretary,
> and it may at any time order additional evidence to be taken before the Secretary, but
> only upon a showing that there is new evidence which is material and that there is
> good cause for the failure to incorporate such evidence into the record in a prior
> proceeding . . . .

42. U.S.C. § 405(g).  "Sentence-six remands may be ordered in only two situations: where the

Secretary requests a remand before answering the complaint, or where new, material evidence is

adduced that was for good cause not presented before the agency."  *Shalala v. Schaefer*, 509 U.S.

292, 297 n.2 (1993) (citations omitted).  The requirements that the evidence be "new" and

"material," and that "good cause" be shown for the failure to present the evidence to the ALJ

have been defined by the United States Court of Appeals for the Sixth Circuit as follows:

> "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not
> in existence or available to the claimant at the time of the administrative proceeding.'
> . . . Such evidence is 'material' only if there is 'a reasonable probability that the
> Secretary would have reached a different disposition of the disability claim if
> presented with the new evidence.' . . . A claimant shows 'good cause' by
> demonstrating a reasonable justification for the failure to acquire and present the
> evidence for inclusion in the hearing before the ALJ . . . .  [T]he burden of showing
> that a remand is appropriate is on the claimant.

*Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*,

279 F.3d 348, 357 (6th Cir. 2001)).

29

The parties dispute only whether the records are material as contemplated under § 405(g). According to Plaintiff, the records at issue are material because they relate to Plaintiff's condition at the time of the hearing and provide further proof that the ALJ erred in his credibility assessment of Plaintiff's testimony.  In support of this assertion, Plaintiff points out that the records reflect that she continued to experience grand mal seizures despite the medications, that she continued to experience absence seizures (some of which were determined to be non-epileptic), and that she had increased medication-side effects.

The Commissioner counters that Plaintiff has failed to satisfy her burden to demonstrate that the evidence at issue is material.  The Commissioner reasons as follows:

> These records, dating from May 2011 to January 2013, show little change in [Plaintiff's] treatment history and the frequency of her grand mal seizures.  Indeed, while [Plaintiff] may have continued to experience non-epileptic staring spells from May 2011 to September 2012, there is no evidence of any grand mal seizures from December 2010 until October 2012—when it appears she began to experience grand mal seizures somewhat regularly through January 2013.  But this evidence of a possible deterioration in [Plaintiff's] condition from October 2012 to January 2013—commencing more than 15 months after [the ALJ's] July 1, 2011 decision—does not warrant remand.

(Comm'r Opp. 6–7, ECF No. 24 (internal citations omitted).)

The Court concludes that the evidence at issue is material as contemplated under Sentence Six of § 405(g).  As discussed above, the ALJ found Plaintiff's allegations of absence seizures to be not credible, a finding which impacted his RFC formulation and ultimate nondisability determination.  Even within her Memorandum in Opposition, the Commissioner correctly acknowledges that the evidence demonstrates that Plaintiff "may have continued to experience non-epileptic staring spells," (*Id.*).  (*See* R. at 1033 (plaintiff continued to report

staring spells to Dr. Klatte in January 2012); R. at 1031 (reports of continued staring spells in May 2012); R. at 1053 (same in November 2012).)

The evidence reflecting that Plaintiff continued to experience tonic clonic/grand mal seizures despite medication also supports remand given that the ALJ's credibility assessment and ultimate nondisability finding was premised heavily upon his determination that medication controlled Plaintiff's seizures.  (*See* R. at 1033 (Dr. Klatte notes that Plaintiff's epilepsy "remains refractory to medications"); R. at 1053 (Plaintiff reports multiple tonic clonic seizures and medication-side effects); R. at 1079–94 (Plaintiff presented to emergency room after having a seizure and reported multiple other tonic clonic seizures); R. at 1025–27 (Dr. Klatte discussed medication changes and a nerve stimulator).)

The Commissioner's speculation that this evidence reflects a deterioration in Plaintiff's condition is not persuasive for two reasons.  First, with regard to her absence seizures, the record reflects that Plaintiff consistently reported experiencing absence seizures.  Second, Dr. Klatte opined that Plaintiff's epilepsy "*remains* refractory," not that it had become refractory.  (R. at 1033.)  Dr. Klatte's opinion echoes that of Plaintiff's other treating neurologists.  (*See, e.g.*, R. at 690 (Dr. Cibula noted that Plaintiff's seizures were "extremely difficult to control"); R. at 736–39, 926, 945–46 (treating neurologist Dr. Ueberroth indicated that Plaintiff was a difficult case, labeling her epilepsy as "refractory" to treatment and opining that she would never be able to achieve seizure freedom because she was unable to do so even on four anti-seizures medications).)  And, as discussed above, the record reflects Plaintiff experienced sixteen grand mal/tonic clonic seizures between October 2009 and December 2010 despite being on medication.  Thus, there exists a reasonable probability that upon consideration of the new

records, the ALJ would have concluded that Plaintiff's epilepsy was refractory to rather than controlled by medications.

## VII.    CONCLUSION

In sum, the Court finds that due to the errors outlined above, the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence.  In addition, the Commissioner should consider the new and material evidence Plaintiff supplied after the hearing.  Accordingly, the Commissioner of Social Security's non-disability finding is **REVERSED** and **REMANDED** to the Commissioner and the ALJ under Sentences Four and Six of § 405(g) for further consideration consistent with this Opinion and Order.

**IT IS SO ORDERED.**


Date:   August 21, 2014                           */s/ Elizabeth A. Preston Deavers*
                                                           Elizabeth A. Preston Deavers
                                                           United States Magistrate Judge